IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GAINES E. HEARNS, JR.,                          :
                                                :
                 Plaintiff                      :
                                                :
            vs.                                 :           3:CV-05-0323
                                                :           (JUDGE VANASKIE)
STEVE PARISI, et al.,                           :
                                                :
                 Defendants                     :

MEMORANDUM

        In this fraudulent home sales and predatory lending action, Plaintiff Gaines E. Hearns,

Jr. sued three categories of Defendants: (1) Steve Parisi, Donald Kishbaugh, and their affiliated

companies (the "PK Defendants");[1] (2) Appraiser Defendants Kevin Kennedy and Kathleen

Spitzfaden; and (3) Lender Defendants M&T Bank, successor by merger to M&T Mortgage

Corporation ("M&T"), and Chase Manhattan Mortgage Corporation ("Chase").  Plaintiff asserts

violations of both the Racketeer Influenced and Corrupt Organizations Act ("Racketeering Act"

or "RICO"), 18 U.S.C. §§ 1961-1968, and the Pennsylvania Unfair Trade Practices and

---

[1]In addition to Steve Parisi and Donald Kishbaugh individually, the PK Defendants include P & K Developers, LLC; Eagle Valley Homes, Inc.; Eagle Valley Homes North Incorporated; Mobile Developing Company; Nations First Mortgage Company; Eagle Mountain Mortgage Company; Kishbaugh and Parisi d/b/a P & K Developers, Inc.; Nations 1st Mortgage Co., LLC; Nations 1st Mortgage Company, Incorporated; and Nations 1st Mortgage Brokers Corporation.

Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 to -9.3.[2]

Pending are motions for summary judgment filed on behalf of each category of Defendants, each of whom argues that Mr. Hearns cannot present facts sufficient to warrant a trial on any of his claims.  M&T also seeks summary judgment as to its breach of contract Counterclaim.  Because Mr. Hearns has not presented evidence sufficient to warrant an inference that Defendants engaged in some fraudulent or predatory lending scheme, or that he sustained any loss as a result of the alleged wrongful conduct, Defendants' motions will be granted.  Moreover, because there is no dispute that Mr. Hearns defaulted on his promissory note, M&T's Motion for Summary Judgment on its Counterclaim will be granted.

I. PROCEDURAL HISTORY

On February 15, 2005, Mr. Hearns commenced this action.  All Defendants filed motions to dismiss, except Appraiser Kevin Kennedy.[3]  This Court, in an opinion issued on March 27, 2006, granted in part and denied in part Defendants' motions to dismiss.  See Hearns v. Parisi, No. 3:CV-05-323, 2006 WL 839362 (M.D. Pa. March 27, 2006).  As a consequence of this Court's ruling, coupled with Plaintiff's failure to file an amended complaint addressing the deficiencies in the original complaint identified in this Court's ruling, there remain the following

---

[2]This Court has jurisdiction over Mr. Hearns' federal law claims pursuant to 28 U.S.C. § 1331, 12 U.S.C. § 2614, and 18 U.S.C. § 1964(c), and jurisdiction over the UTPCPL claims pursuant to 28 U.S.C. § 1367(a).

[3]It does not appear that Mr. Kennedy was ever served with process.

causes of action: (1) the PK Defendants conducted the affairs of an enterprise through a pattern of racketeering activity ("First Claim"); (2) M&T and Chase conspired with the PK Defendants to violate the Racketeering Act ("Second Claim");[4] (3) the Appraiser Defendants conspired with the PK Defendants to violate the Racketeering Act ("Third Claim"); (4) the PK and Appraiser Defendants violated the UTPCPL ("Fourth and Fifth Claims"); and the PK Defendants violated the UTPCPL by a "bait and switch" scheme ("Sixth Claim").

Discovery has been completed.  Now pending before the Court are Defendants' motions for summary judgment.  The motions have been fully briefed and are ripe for resolution.

II. BACKGROUND

On October 16, 2000, Mr. Hearns elected to purchase a 2.5 acre parcel of land and house package from P&K Developers, LLC and Eagle Valley Homes Inc. for $36,500 and $179,400, respectively.  (PK Defs.' App. Vol. I Mem. Supp. Mot. Summ. J., Dkt. Entry 70-2, at 70a-73a.)  On November 19, 2000, Mr. Hearns signed and entered into a Mortgage Loan Origination Agreement with Nations 1st Mortgage Company for the purpose of obtaining financing for his home.  (Id. at 83a, 84a.) On that same day, Mr. Hearns also filled out and signed a Uniform Residential Loan Application, prepared by a representative of Nations 1st Mortgage Company,  (Ex. 14, Def. M&T's App. Supp. Mot. Summ. J., Dkt. Entry 102-2, at 21),

---

[4]The parties stipulated to the dismissal of all claims and cross-claims against Chase. (Stipulation filed Feb. 16, 2007, Dkt. Entry 97.)  Consequently, it is no longer a party to this action.

and a Private Mortgage Insurance ("PMI") Initial Disclosure document, which notifies a borrower of the obligation to obtain PMI.  (PK Defs.' App. Vol. II Mem. Supp. Mot. Summ J., Dkt. Entry 70-3, at 122a.)  As an explanation for entering into this allegedly unfair contract, Mr. Hearns claims the PK Defendants used excessive pressure in selling the property by encouraging him to put down a deposit at the time of his visits.[5]  (Id. at 150a-153a.)

Central to the ability to secure financing was a valuation of the 2.5 acre lot with the house constructed on it.  On November 29, 2000, NEPA Appraisal Services performed an appraisal of the property with improvements, valuing it at $220,000.  (Id. at 124a-135a.)  This appraisal was performed by Defendant Kennedy as an independent contractor of NEPA Appraisal Services.  Defendant Spitzfaden, President of NEPA Appraisal Services, singed the appraisal in a supervisory capacity.  The appraisal was commissioned by Nations 1st Mortgage Company, one of the PK Defendants.

Nations 1st ultimately obtained financing for Mr. Hearns through M&T, which agreed to loan him $209,000 in the form of a construction and home loan.  (Id. at 96a-119a.)  M&T verified information contained in the NEPA appraisal, including the comparable properties used by Kennedy as well as the adjustments made by Kennedy with respect to the comparable

---

[5]In particular, Mr. Hearns stated the PK Defendants exerted excessive sales pressure by calling him and attempting to have him sign and buy the property. (Id. at 151a, 152a.)  Plaintiff has admitted, however, that he could have said no at any time and walked away. (Id. at 153a.)

4

properties.  (Aff. of Sheri Edwards, Dkt. Entry 107-3, ¶¶ 15-21.)  M&T also followed accepted

underwriting standards in extending financing to Mr. Hearns.  (Id. at ¶¶ 25-33.)  The information

available to M&T indicated a primary housing expense/income ratio of 25.44%; a total

obligation/income ratio of 36.05%; and a credit score of 748.  (Id. at ¶¶ 31-33.)  M&T asserts

that a credit score above 700 is regarded as "exceptional."  (Id. at ¶ 33.)

In completing the purchase, Mr. Hearns executed several documents, which included

signing a note in favor of M&T Mortgage.  (Id. at 96a-119a.)  Mr. Hearns agreed to the following

provisions in the note:

> (B) Default: If I do not pay the full amount of each monthly payment on the
> date it is due, I will be in default.
> (C) Notice of Default: If I am in default, the Note Holder may send me a
> written notice telling me that if I do not pay the overdue amount by a certain date,
> the Note Holder may require me to pay immediately the full amount of principal
> which has not been paid and all the interest that I owe on that amount.  That date
> must be at least 30 days after the date on which the notice is delivered or mailed
> to me. . . .

(Ex. A, Def. M&T's Mot. Summ. J., Dkt. Entry 100-2, at 23, ¶ 6(B), (C), & (E)).

Mr. Hearns also executed a HUD-1 Settlement Statement indicating his actual

settlement costs, (PK Defs.' App. Vol. II Mem. Supp. Mot. Summ. J., at 120a-121a), a

Mortgage Insurance Rider relative to his mortgage insurance obligations,[6] (id. at 115a-118a),

---

[6]Mr. Hearns alleges that the PK Defendants did not disclose that he was required to pay
PMI until after the closing took place.  In contradiction to this claim, the PK Defendants point to
the Private Mortgage Insurance Initial Disclosure document that Mr. Hearns signed, notifying
him of his obligation to obtain PMI on November 19, 2000, one month before the closing.  (PK

and a Uniform Residential Loan Application.  (PK Defs.' App. Vol. I Mem. Supp. Mot. Summ. J., at 85a-95a.)  Finally, to complete the closing process, Mr. Hearns signed a form acknowledging his responsibility to pay any increased taxes resulting from assessments for improvements on his property.  (Ex. 37, Def. M&T's App. Mot. Summ. J., Dkt. Entry 102-3, at 47.)

On May 7, 2001, Mr. Hearns signed a Note Modification Agreement with M&T, converting his construction loan to a permanent loan.  (Ex. 18, Def. M&T's App. Mot. Supp. Summ. J., Dkt. Entry 102-2, at 36; PK Def.s' App. Vol. II Mem Supp. Mot. Summ. J., at 27.)  According to the agreement, Mr. Hearns agreed to repay M&T $209,000 at an annual interest rate of 7.75% over thirty years, with a monthly principal and interest payment of $1,497.30.[7]  (Id.)  M&T again advised Mr. Hearns by letter of his responsibility to pay the real estate taxes.  (Ex. 36, Def. M&T's App. Supp. Mot. Summ. J., p. 46.)

In July of 2001, M&T transferred the right to service Mr. Hearns' loan to Chase.  (Aff. Claudia Heath, Dkt. Entry 100, ¶ 10.)  A few months later, on October 16, 2001, Mr. Hearns obtained a second mortgage on his house from Beneficial Consumer Discount Company in the amount of $17,000 to pay for a water filter and pay off credit card debt.  (PK Defs.' App. Vol. II Mem. Supp. Mot. Summ. J., at 138a-144a; Dep. Mr. Hearns, Dkt. Entry 102-4, at 27.)

Later, in June of 2003, Mr. Hearns hired John J. Lavelle Appraisal Service, who

---

Defs.' App. Mem. Supp. Mot. Summ J., at 122a.)

[7] There is no evidence that this transaction was "subprime," or that the interest rate was above prevailing rates at the time.

performed an appraisal of his property, valuing it at $210,000 as of June 2, 2003.  (App. Pl's

Mem. Opp'n PK Def.'s Mot. Summ. J., Dkt. Entry 115, at 1a-7a.)  Believing that the 2003

appraisal suggested that the initial appraisal of $220,000 in November of 2000 was fraudulent,

Mr. Hearns halted mortgage payments.  (PK Defs.' App. Vol. II Mem. Supp. Mot. Summ. J., at

173.)  He has since failed to set aside mortgage payments.  (Id. at 174a.)  Mr. Hearns also

stopped paying his real estate taxes and home owner insurance premiums in December of

2003.  (Defs.' App. Mem. Supp. Mot. Summ J., at 146a.)

On May 6, 2005, M&T reacquired the servicing rights to Mr. Hearns' loan from Chase.

(Ex. 38, Def. M&T's App. Supp. Mot. Summ. J., at 48.)  M&T claims that Mr. Hearns owes it a

total of $285,366.84 as of February 8, 2007.[8]  (Def. M&T's Statement of Undisputed Facts, Dkt.

Entry 99, ¶ 35.)

III. DISCUSSION

A.  Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

---

[8]This total claimed by M&T consists of $204,052.50 in principal payments, $51,247.73 in
interest, $25,109.36 in escrow charges (for taxes and insurance M&T has been forced to pay
on the home), $1,572.27 in late charges, pro rata PMI of $271.70, recording fees of $28.50,
inspection fees of $27.00, and $3,057.78 in other expenses, excluding attorney's fees.  (Def.
M&T's Statement of Undisputed Facts, Dkt. Entry 99, ¶ 35.)

matter of law." FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or non-

existence might affect the outcome of the suit under applicable law.  Anderson v. Liberty Lobby

Inc., 477 U.S. 242, 248 (1986).  "Facts that could alter the outcome are material facts."

Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994).  "[S]ummary judgment will

not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 ( 1986).  All doubts as to the

existence of a genuine issue of material fact must be resolved against the moving party, and

the entire record must be examined in the light most favorable to the nonmoving party.  White

v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  Once the moving party has

satisfied its burden, the nonmoving party "must present affirmative evidence in order to defeat a

properly supported motion for summary judgment." Anderson, 477 U.S. at 257.  Mere

conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion

for summary judgment once the moving party has presented evidentiary materials.  Schoch v.

First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires the entry of

summary judgment if there was adequate time for discovery and a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

8

B.  The First Through Fourth Claims

Plaintiff's RICO claims (the First through Third Claims) and his first UTPCPL claim (the Fourth Claim) are based upon the contention that the entire transaction was premised upon a fraudulently inflated appraisal.  As explained by Plaintiff in opposing M&T's summary judgment motion:

> Upon information and belief, the appraisal and financing by M&T are major elements of the alleged conspiracy.  Without an appraisal, the Plaintiff could not receive a mortgage.  Without a mortgage, there would be no sale of the property. Upon information and belief, the awarding of the mortgage to the Plaintiff based on the inflated appraisal was essential to carrying out the scheme.

(Dkt. Entry 105 at 9.)

Absent evidence that the appraisal was a fraud, Plaintiff has no basis for a recovery under the first four claims of his Complaint.  Stated another way, without evidence of an inflated appraisal, Plaintiff cannot show that he sustained an injury attributable to wrongful conduct of the Defendants.

The Racketeering Act provides civil damages for "any person injured in business or property by reason of a violation of 18 U.S.C. § 1962."  18 U.S.C. § 1964(c) (1995) (emphasis added).  The question of whether a plaintiff made out a claim of injury to his or her business or property as a result of a pattern of racketeering activity in violation of RICO has been described as a standing issue.  See Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000) (considering standing in the context of whether appellants have alleged a valid RICO injury to business or

property); see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 520 (3d Cir. 1998) (pointing to section 1964(c) as the "standing requirement" for RICO suits).  Along with the Article III constitutional and prudential standing requirements, a plaintiff seeking recovery under RICO must satisfy the additional standing requirement of injury to property or business as a proximate result of the alleged pattern of racketeering activity.  See Maio, 221 F.3d at 482.

A plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business and property by the conduct constituting the [RICO] violation."  Sedima, S.P.R.L., v. Imrex Company, Inc., 473 U.S. 479, 496 (1985).  The Third Circuit has read section 1964(c) "as requiring two distinct threshold showings: (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962."  Maio, 221 F.3d at 483.  If Plaintiff's property was indeed overvalued, then he paid more than its fair market value (and may have paid higher interest rates for his loan), and thereby incurred a cognizable injury under RICO.  See Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239, 249 (3d Cir. 2001) (finding that "when a defendant fraudulently misleads individuals into purchasing equity interests in real property, an injury occurs at the time of investment"); Maio, 221 F.3d at 489 (reasoning that when a property interest of tangible nature is at stake, an injury to that property may be demonstrated by reference to external conditions or the occurrence of events which cause the value of the real

or personal property to be reduced); Heinold v. Perlstein, 651 F. Supp. 1410, 1411 (E.D. Pa. 1987) (finding that even though the plaintiff was induced by misrepresentations as to the value of the diamond ring, the plaintiff did not suffer an injury in purchasing the ring because he did not pay more than its fair market value).

Recovery on a fraud claim, as presented in the Fourth Claim under the UTPCPL, is likewise dependent upon proof of "the difference in value between the real, or market value, of the property at the time of the transaction and the higher, or fictitious value, which the buyer was induced to pay for it." Skurnowicz v. Lucci, 798 A.2d 788, 795 (Pa. Super. Ct. 2002). Thus, whether viewed as a standing or substantive merits question, the ability of Plaintiff to recover in this action depends upon proof of a fraudulent appraisal.

As proof that his property (appraised at $220,000 in 2000) was overvalued at $220,000 in November of 2000 Plaintiff submits an appraisal conducted in 2003 by John J. Lavelle Appraisers, which valued his property at $210,000.  (App. Pl.'s Mem. Opp'n PK Def.s' Mot. Summ. J., at 1a-7a.)  Defendants correctly point out that this appraisal by itself does not establish an overvalued property value in the year 2000.  (PK Def.s' Reply Mem., Dkt. Entry 83, at 4.)  The mere fact that an appraiser estimated a value to the property that was 95% of the value assigned two and one-half years earlier does not mean that the first appraisal was fraudulent.  In this regard, the record does not include competent evidence explaining the difference in values of the property between 2003 and 2000.

Significantly, Plaintiff did not tender any evidence suggesting defects in either the information considered or the methodology employed by Kennedy and NEPA Appraisal Services.  Compare United States v. Cassige, 4 F.3d 1006, 1013-15 (1st Cir. 1993) (detailing evidence of discrepancies and irregularities in appraiser's reports, including falsification of property conditions and comparable properties, sufficient to support an inference of fraud).  Nor has Plaintiff proffered an expert opinion that the appraisal in this case failed to comply with industry standards or used inappropriate information.  Compare United States v. Owens, 301 F.3d 521, 525 (7th Cir. 2002) (evidence that appraisal was inflated fraudulently included testimony of expert witness that appraiser failed to comply with applicable standards and used inappropriate properties and comparables); United States v. Musgrave, 483 F.2d 327, 336 (5th Cir. 1973) ("The crucial evidence which exposed the inflated appraisals consisted of expert opinion testimony. . . .").  By way of contrast, M&T has tendered evidence that it verified the information in the NEPA Appraisal Services report to assess its reliability.

Plaintiff asserts that he will be able to offer testimony at trial regarding the market conditions in 2000.  (Pl.'s Mem. Opp'n PK Def.s' Mot. Summ. J., at 8.)  A party, however, cannot defeat summary judgment by stating that it intends to present testimony in the future, as has been done here.  Celotex, 477 U.S. at 322.   The trial stage is too late.  Thus, Plaintiff has failed to set forth evidence sufficient to demonstrate a cognizable injury under RICO.

There is simply no evidence in this case of any improper action in connection with the

appraisal performed by NEPA Appraisal Services.[9]  Accordingly, Defendants are entitled to

summary judgment on the RICO and first UTPCPL claims.  Cf.  Do v. Pilgrim's Pride Corp., 512

F. Supp. 2d 764, 768 (E.D. Tex. 2007) (summary judgment granted on the plaintiffs'

Racketeering Act claim premised upon contention that the defendant participated in a RICO

enterprise by providing a grossly inflated appraisal where plaintiffs "produce[d] no expert

evidence or other competent summary judgment evidence that indicates the appraisal of [the

property] was grossly inflated.").

       M&T and the Appraiser Defendants have also established an entitlement to summary

judgment on the RICO conspiracy claims on other grounds.  M&T, relying on Dongelewicz v.

PNC Bank Nat'l. Ass'n., 104 F. App'x 811, 818 (3d Cir. 2004), asserts that Mr. Hearns cannot

produce evidence to support a conspiracy claim under RICO that M&T directly participated in

fraud.  In a similar manner, the Appraiser Defendants argue that Plaintiff's complaint is "pure

fiction and a collection of allegations without any evidentiary support."  (Appraiser Def.s' Br.

Supp. Mot. Summ. J., Dkt. Entry 85, at 7.) The Appraiser Defendants assert that there is no

evidence that they communicated with their co-defendants and no evidence that they acted to

---

       [9]Unlike Mr. Hearns, Almus and Marilyn Wilson presented independent evidence of errors
and irregularities in the appraisal that served as the premise for their acquisition of a home so
as to warrant denial of summary judgment on RICO and UTPCPL claims against both the PK
Defendants and Lisa Marie Gibson, the appraiser involved in the Wilsons' transaction.  Wilson
et al. v. Parisi et al., No: 3:CV-04-1737 Memorandum Op. at 37-40 (M.D. Pa. February 26,
2008.)  The evidence included findings of an agency that the appraisal violated appropriate
standards.

further the alleged conspiracy.  (Id.)

The RICO conspiracy statute provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d) (1995). The elements predominant in a subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering.  Salinas v. United States, 522 U.S. 52, 62 (1997).[10]  The plain implication of these provisions "is that one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not personally agree to do, or conspire with respect to, any particular element." Smith v. Berg,  247 F.3d 532, 537 (3d. Cir 2001).  The RICO conspiracy provision, because there is no requirement of some overt act or specific act, is even more comprehensive than the general conspiracy offense.  Salinas, 522 U.S. at 63.  In fact, "a defendant may be held liable for conspiracy to violate section 1962(c) if he *knowingly* agrees to *facilitate a scheme* which includes the operation or management of a RICO enterprise."  Smith, 247 F.3d at 538 (emphasis added); Salinas, 522 U.S. at 64 ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty

---

[10]18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

as the perpetrators."); Dongelewicz, 104 F. App'x at 818.

In the instant case, the competent evidence does not sustain the claim that M&T and the Appraiser Defendants' knowingly agreed to facilitate a scheme to defraud under RICO.   The record simply demonstrates that the Appraiser Defendants conducted an appraisal of Plaintiff's property and that M&T, after being contacted by Nations 1st Mortgage Company, provided the financing for Plaintiff's purchase.  Beyond this, there is no evidence of knowingly agreeing to facilitate a scheme to defraud.

Reiterations of the complaint are simply insufficient at this stage in the litigation.[11]  A nonmoving party cannot "simply reassert factually unsupported allegations contained in [the] pleadings."  Williams, 891 F.2d at 460 (citing Celotex, 477 U.S. at 325).  Plaintiff lacks competent facts evidencing any sort of conspiring by the Defendants.  There is no evidence of Defendants' communications, plans or knowledge of a scheme.  At best, M&T extended financing after being contacted by Nations 1st Mortgage Company and the Appraiser Defendants performed an appraisal on Plaintiff's property in the normal course of their business practice.

---

[11]Plaintiff claims that he knows that Nations 1st Mortgage Company contacted the Appraiser Defendants to perform the appraisal and that the Appraiser Defendants have conducted other appraisals for Nations 1st Mortgage Company.  (Pl. Br. Opp'n Appraiser Def.s' Mot. Summ. J., Dkt. Entry 92, at 7.)  These allegations do not satisfy the requirement that the defendant "knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."  Smith, 247 F.3d at 538 (emphasis added).

Plaintiff also makes other bald assertions that lack the requisite factual basis to reveal a genuine dispute of a material fact.  Plaintiff alleges that M&T did not verify Mr. Hearns' loan-to-value ratio, but fails to point out any mistakes or deficiencies in M&T's documentation.[12]  (Pl.'s Br. Opp'n Def.'s M&T Mot. Summ. J., Dkt. Entry 105, at 7.)  M&T, by way of contrast, has submitted documentation it obtained and reviewed before agreeing to underwrite Mr. Hearns' loan.  (Ex. D, E, F, G, H & I, Def. M&T's Reply Br. Supp. Mot. Summ J., Dkt. Entry 107-3.) Specifically, M&T has shown that it reviewed credit reports, verification of deposit information, employment information, savings and/or checking account information, the agreements reflecting the house and lot purchase signed by Mr. Hearns, and verification of Mr. Hearns' wages information, including a 1099 Form from Mr. Hearns' employer.  (Id.)

In short, Plaintiff's belief that there was a conspiracy to defraud him and that his "property was appraised at a value in excess of what it was worth . . ." is not enough.  (Pl's Opp'n Def. M&T's Mem. Supp. Summ. J., at 9-10.)  A mere belief, without more, is wholly insufficient to survive a motion for summary judgment.

C.  Plaintiff's Remaining Claims

Plaintiff also submits claims that the PK and Appraiser Defendants violated the UTPCPL

_____

[12] The loan-to-value ratio is determined by dividing the sales price or appraised value of a home into the loan amount expressed as a percentage.  According to Sheri Edwards, Administrative Vice President of M&T, Mr. Hearns' loan-to-value ratio of 95% met or exceeded Freddie Mac underwriting guidelines applicable at the time the loan was made.  (Aff. of Sheri Edwards, Dkt. Entry 107-3, at ¶ 30.)

by violating 15 U.S.C. § 1664(d) and Regulation Z, 12 C.F.R. § 226.24(c)(1).[13]  Plaintiff also

claims a violation of the UTPCPL by the PK Defendants through a "bait and switch" claim.

Plaintiff, however, has not presented any advertisement claimed to have been read by

him and which violated 15 U.S.C. § 1664(d) or Regulation Z.  Thus, Plaintiff cannot show a

violation of either the Truth in Lending Act or Regulation Z.  See Strang v. Wells Fargo Bank,

NA, No. 04-CV-2865, 2005 WL 1655886, at *8 (E.D. Pa. July 13, 2005).  Nor has Mr. Hearns

---

[13]Section 1664(d) of Title 15 U.S.C. provides:

Requisite disclosures in advertisement

If any advertisement to which this section applies states the
amount of the down payment, if any, the amount of any installment
payment, the dollar amount of any finance charge, or the number
of installments of the period of repayment, then the advertisement
shall state all of the following items: (1) The down payment, if any.
(2) The terms of repayment. (3) The rate of the finance charge
expressed as annual percentage rate.

Section 226.24 of 12 C.F.R.., known as Regulation Z, provides:

If any of the following terms is set forth in an advertisement, the
advertisement shall meet the requirements of paragraph (c)(2) of
this section: (i) The amount or percentage of any down payment.
(ii) The number of payments or period of repayment.  (iii) The
amount of any payment.  (iv) The amount of any finance charge.

Paragraph (c)(2) of Regulation Z provides that an advertisement stating any of the terms set
forth in paragraph (c)(1) must include the following: (i) the amount or percentage of the down
payment; (ii) the terms of repayment; (iii) the annual percentage rate, using that term, and, if
the rate may be increased after consummation, that fact.

shown that the Appraiser Defendants engaged in any advertising sufficient to impose liability here.

Finally, there is no evidence of a "bait and switch" scheme.  As to this claim, Plaintiff merely reiterates at page 15 of his brief opposing the PK Defendants' Summary Judgment Motion his unsubstantiated assertion of a fraudulent appraisal:  "The Parisi Defendants baited the Plaintiff with their advertisements, mailers and promises, and then perpetrated their scheme to defraud the Plaintiff through the inflated appraisal and misrepresentations as to vale [sic] and taxes."  Thus, summary judgment on this claim is warranted as well.

D.  M&T's Counterclaim

Defendant M&T seeks judgment in its favor for all amounts owed by Plaintiff under the mortgage note.  (Def. M&T's Mem. Supp. Mot. Summ. J., at 20.)  M&T states that, because Plaintiff does not dispute that he is in default, nor that he owes $285,366.84, a judgment in its favor is warranted.  (Id.)  Plaintiff argues that he stopped making mortgage payments because of the inflated appraisal of his property,  (Pl.'s Br. Opp'n Def. M&T's Mot. Summ. J., at 11), and that M&T should be required to proceed with a complaint in mortgage foreclosure and should not be permitted to secure a judgment until the resolution of this action. (Id.)

Plaintiff's argument lacks merit.  "Upon default, the holder of a mortgage can legally proceed to enforce the terms of the mortgage either by foreclosure proceedings or by obtaining judgment on the bond accompanying the mortgage and issuing a writ of execution."

Cunningham v. McWilliams, 714 A.2d 1054, 1057 (Pa. Super. Ct. 1998).

The note signed by Mr. Hearns provides that, "[i]f I do not pay the full amount of each monthly payment on the date it is due, I will be in default." There does not appear to be any factual dispute in this regard; both parties agree that Plaintiff has not made the required monthly payments since January 1, 2004. (Claudia Heath Aff., ¶¶ 13-15; Pl. Br. Opp'n M&T's Mot. Summ. J., at 11; Hearns Dep., Dkt. Entry 102-4, at 35-36.) Thus, Mr. Hearns is in default and M&T may enforce the terms of the note.

M&T seeks $285,366.84 for amounts due under the note for the principal, principal balance interest, late charges, escrow, pro rata PMI, miscellaneous expenses, recording fees and inspections. M&T's motion for this undisputed amount will be granted.

IV.  CONCLUSION

For the reasons set forth in the foregoing memorandum, Defendants' Motions for Summary Judgment and M&T's Motion for Summary Judgment on its Counterclaim will be granted. An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GAINES E. HEARNS, JR., | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | 3:CV-05-0323 |
| | : | (JUDGE VANASKIE) |
| STEVE PARISI, <u>et al.</u>, | : | |
| | : | |
| Defendants | : | |

## ORDER

NOW, THIS 3rd DAY OF MARCH, 2008, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1.  The PK Defendants' Motion for Summary Judgment (Dkt. Entry 69) is GRANTED.

2.  The Appraiser Defendants' Motion for Summary Judgment (Dkt. Entry 84) is GRANTED.

3.  Defendant M&T's Motion for Summary Judgment (Dkt. Entry 98) is GRANTED.

4.  The Clerk of Court is directed to enter judgment in favor of M&T and against Counterclaim Defendant as to M&T's Counterclaim in the amount of $285,366.84.

5.  The Clerk of Court is further directed to enter judgment in favor of the Defendants and against the Plaintiff on all Plaintiff's claims and to mark this matter CLOSED.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge